James W. CLEARY, Plaintiff–Appellant,

v.

NEWS CORPORATION and HarperCollins Publishers, Inc., Defendants–Appellees.

No. 92–55697.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1993.

Decided Aug. 1, 1994.

Joseph E. Mueth, Los Angeles, CA, for plaintiff-appellant.

Louis P. Petrich, Leopold, Petrich & Smith, Los Angeles, CA, and Slade R. Metcalf, Squadron, Ellenoff, Plesent & Lehrer, New York City, for defendants-appellees.

Before: FLETCHER and D.W. NELSON, Circuit Judges, and WILL,[*] Senior District Judge.

Opinion by Senior District Judge WILL.

WILL, Senior District Judge:

Dr. James W. Cleary sued News Corporation, the publishers of *Robert's Rules of Order*, under the Lanham Act, 15 U.S.C. § 1125, for alleged misattribution of his work product. He also brought state law claims for unfair competition, breach of contract, and intentional or negligent infliction of emotional distress. The district court granted summary judgment in favor of the defendants on all counts. The district court had jurisdiction over Cleary's Lanham Act claim under 15 U.S.C. § 1121, and over the state law claims under the doctrine of supplemental jurisdiction, as well as diversity of citizenship. Cleary timely appealed the grant of summary judgment. We have jurisdiction under 28 U.S.C. § 1291. For the following reasons, we affirm.

## I.

## BACKGROUND

During the 1960s, James W. Cleary helped revise *Robert's Rules of Order* for Scott, Foresman and Company.[1] When the 1970 edition was published, Dr. Cleary was listed on the title page as having assisted the named author, Sarah Corbin Robert, along with Henry M. Robert III and William J. Evans. The work was republished in 1980 and once again title page credit was given to Cleary, Robert III, and Evans. The most

---

[*] Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

1. Appellee News Corporation is the parent corporation of HarperCollins Publishers. Scott, Foresman was acquired in 1989 by HarperCollins and is a wholly-owned subsidiary of HarperCollins. Appellees will be referred to as "Scott, Foresman", throughout this opinion because the majority of the relevant transactions and communications involved in this case were between Dr. Cleary and Scott, Foresman.

recent edition was published in 1990. The title page for this edition was virtually identical to the 1970 and 1980 versions with the most notable change being the omission of Dr. Cleary's name. Upon learning of the omission, Dr. Cleary initiated this lawsuit. The district court subsequently granted the defendant's motion for summary judgment on all counts.

Many of the facts underlying this litigation are undisputed. Currently in its ninth edition, *Robert's Rules of Order* is one of the leading sources of parliamentary law in the United States. *Robert's Rules* was first published in 1876 by General Henry Martyn Robert; he has been listed as the author of every edition of *Robert's Rules* since. After General Robert's death, members of the Robert family maintained ultimate authority over any changes. Robert's Rules Association, successor-in-interest to General Robert's rights, owns the copyright to each edition.

In 1960, Sarah Corbin Robert, General Robert's daughter-in-law, began working on what was to become the 1970 edition of *Robert's Rules*. Sarah Robert's son, Henry M. Robert III, and William J. Evans became involved in the writing and editing of the 1970 edition. In 1961, Dr. James W. Cleary was retained by Scott, Foresman to provide a critique of the previous edition of *Robert's Rules,* and in 1965, Cleary was retained as Advisory Editor to the revision.

Curtis Johnson, an employee of Scott, Foresman, testified at his deposition that prior to entering into the contract, Scott, Foresman had orally agreed to give title credit to Cleary. Johnson stated that, in light of the low royalty rate, "[r]ight from the start [name credit] was the inducement that was supposed to persuade Dr. Cleary to do the work." Excerpt of Record ("E.R."), ex. K at 12. Johnson also testified that, in fact, he did offer Cleary title credit. Most relevant to this appeal is a letter dated May 19, 1965, and addressed to Cleary, in which Johnson discusses the proposed royalty terms at some length and concludes, "[W]e will, of course, appropriately credit you in the new edition, as well." E.R., ex. K at 107.

Subsequently, however, on September 3, 1965, Cleary entered into an agreement with Scott, Foresman concerning his role in the revision. Cleary agreed to validate the then-existing copy for the 1970 edition, to compile and complete copy for three chapters, and to write new copy for two chapters. In return, Scott, Foresman agreed to pay Cleary a royalty of three-quarters of one percent of the net receipts from sales of the 1970 edition, with Scott, Foresman reserving the right to adjust the royalty rate with respect to future editions of the book to reflect the amount of original work prepared by Cleary that remained in any subsequent edition. The contract specified that Cleary was retained on a work for hire basis and that the heirs of General Robert would retain all rights in *Robert's Rules* and in the copyright. The contract did not mention giving Cleary any title credit for the 1970 edition or any subsequent editions.

Cleary began working on the revision. According to Cleary, Sarah Robert had completed a mere outline of the work and Robert III was not producing usable material. Therefore, Cleary wrote a large amount of the new edition, which was subsequently edited by Sarah Robert and, because of her rapidly declining health, by Robert III. Cleary testified that he had contributed approximately forty percent of the final edition, Robert III had contributed forty percent, and Evans had contributed twenty percent.

In 1980, Scott, Foresman published a new edition, with minor revisions. Scott, Foresman provided Cleary with an opportunity to review the changes; none of Cleary's proposed changes were incorporated into the new edition. Cleary continued to receive title credit and three-quarters of one percent royalties for sales of the 1980 edition.

The most recent edition, referred to as the 1990 edition, was published in late 1989. It is undisputed that Cleary did not participate in the preparation of the 1990 edition. After the 1990 edition was published, Cleary learned that his name had been deleted from the title page, although he was still acknowledged in the introduction. Sarah Corbin Robert was still listed as the author, although she had died in 1972, and Robert III

and Evans were listed as providing assistance.

The parties' primary factual disagreement focuses on the extent of the revisions in the 1990 edition. The new edition was printed in a larger print type, which changed the pagination. Cleary insists that any other changes were minor. In evidence is a list of "buzz words" with special significance only to Cleary, that have remained in virtually identical places in the book. E.R., ex. C. In his declaration in opposition to summary judgment, Cleary acknowledged that reviewers of the 1990 edition listed "14 important areas of revision" between the 1970 and 1990 editions. However, he asserts that these changes consist merely of additional words, sentences or paragraphs; other than these few changes, he claims the text is essentially the same as the 1970 version. Scott, Foresman, on the other hand, insists that the 1990 edition is a major revision, and that the entire revision was prepared by Robert III and Evans.

In evidence are two reviews of the 1990 edition, both published in *Parliamentary Journal*. E.R., ex. D and E. The reviewers each characterize the new edition as a book-selling strategy, but discuss new and substantial changes in the edition. Also included in evidence is a list of changes compiled by the Registered Parliamentarian of Southern California. E.R., ex. F. This list, covering approximately the first half of the 1990 edition, records each of 73 changes made since the 1980 edition.

Dr. Cleary has continued to receive three-quarters of one percent royalties on sales of the 1990 edition. As part of an attempted settlement of this case, the title page of subsequent printings of the 1990 edition after the first printing listed Cleary as providing assistance just as in the 1980 version.

**2.** The statute provides, in pertinent part:

Any person who shall affix, apply, or annex or use in connection with any goods or services ... a false designation of origin, or any false designation or representation and shall cause such goods or services to enter into commerce ... shall be liable in a civil action by any person ...' who believes that he is or is likely to be damaged by the use of any such false designation or description.

15 U.S.C. § 1125(a).

## II.

## DISCUSSION

The standard of review of a grant of summary judgment is *de novo*. *See Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Summary judgment may be granted when, viewing the evidence in the light most favorable to the non-moving party, no genuine issues of fact remain and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Summary judgment must be entered against a party who fails to present evidence sufficient to establish an essential element of that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### A. *Lanham–Trademark Act Claim*

■ Section 43(a) of the Lanham Act prohibits the use of false designations of origin and false representations in the advertising and sale of goods and services. *Smith v. Montoro*, 648 F.2d 602, 603 (9th Cir.1981).[2] Cleary argues that the defendants violated § 43(a) when they removed his name from the title page of *Robert's Rules*, after crediting him for twenty years.

■ Scott, Foresman argues that because Cleary signed a contract containing a "work for hire" agreement, Scott, Foresman had no obligation to provide title credit in the 1970 edition, or any subsequent edition. Under copyright law, a work for hire clause vests all authorship rights in the employer. 17 U.S.C. § 201(b).[3] Consequently, because the em-

**3.** Cleary argues that the work for hire provision does not apply at all because he was not a ·salaried employee of Scott, Foresman. However, under the 1909 Copyright Act, which is applicable to works commissioned prior to January 1, 1978, courts generally presume that the commissioned party under a work for hire agreement has impliedly agreed to convey the copyright, along with the work itself, to the hiring party. *See, e.g., Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d Cir.), *reh'g granted and rev'd in part on other grounds*, 223

ployer is considered the author of the work, once authorship rights are relinquished through a work for hire contract provision, the right to attribution is also relinquished unless that right is reserved explicitly in the contract. *See, e.g., Vargas v. Esquire, Inc.,* 164 F.2d 522, 524–27 (7th Cir.1947) (holding that an artist could not claim a right of attribution against a magazine sounding in contract or unfair competition where the artist granted the magazine all rights to his drawings in exchange for monthly compensation); *Nelson v. Radio Corp. of Am.,* 148 F.Supp. 1 (S.D.Fla.1957) (denying a singer a right to attribution in the absence of an agreement to provide label credit, where the court found a master-servant relationship between the singer and the recording company).

Cleary's contract with Scott, Foresman contained an explicit "work for hire" clause and did not mention giving Cleary title credit. Moreover, as will be discussed in Part C, *infra,* the parol evidence rule bars Cleary's attempt to introduce an attribution clause into the contract. Thus, when Cleary agreed to "work for hire," Scott, Foresman became the author of all material written by Cleary and, therefore, under the contract was not obligated to provide Cleary with title credit for his work.

■ Without conceding the point, Cleary argues that even if he did not have a contractual right to attribution, the Lanham Act nevertheless protects against misattribution. This Circuit has long recognized a form of misattribution or "reverse passing off" in the context of § 43(a) of the Lanham Act. *See Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.,* 7 F.3d 1434, 1437 (9th Cir. 1993); *Shaw v. Lindheim,* 919 F.2d 1353, 1364 (9th Cir.1990); *Lamothe v. Atlantic Recording Corp.,* 847 F.2d 1403, 1406 (9th Cir. 1988); *Smith v. Montoro,* 648 F.2d 602, 607 (9th Cir.1981). "Reverse passing off" or "reverse palming off" occurs when a product is mislabeled to mask the creator's contribution. Moreover, "failure to attribute authorship to a co-author resulting in only partially

accurate designation of origin constitutes reverse palming off within the ambit of Section 43(a)." *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 243 (S.D.N.Y.) (citing *Lamothe,* 847 F.2d at 1407), *aff'd,* 923 F.2d 845 (2d Cir.1990).

Cleary argues that removing his name from the title page after giving him credit for twenty years is "reverse passing off," since Scott, Foresman omitted his name from the title page of the 1990 edition even though it is essentially the same text as the earlier versions that bore his name. Thus, Cleary urges this Court to hold that the Lanham Act protects an author against an inaccurate designation of authorship despite the fact that the author expressly contracted away the right to attribution.

This circuit has never considered the rule urged by Cleary. Consistent with Cleary's argument, the case law does suggest that the Lanham Act does not create a duty of express attribution, but does protect against misattribution. *See, e.g., Morita v. Omni Publications Int'l, Ltd.,* 741 F.Supp. 1107, 1114 (S.D.N.Y.1990) (citing *Lamothe v. Atlantic Recording Corp.,* 847 F.2d 1403 (9th Cir.1988)), *vacated,* 760 F.Supp. 45 (1991); *see also* 2 Paul Coldstein, *Copyright* § 15.24.-2.2 (1989) ("even an author who has no right against nonattribution may have a right against misattribution [under section 43(a) of the Lanham Act].”). Yet none of these cases involved situations where the original author had contracted away attribution rights through a work for hire clause, and Cleary has failed to cite any case which directly supports his proposed rule.

In fact, the case most nearly on point is *Vargas v. Esquire, Inc.,* 164 F.2d 522 (7th Cir.1947). In *Vargas,* Alberto Vargas agreed to produce pictures for Esquire. Esquire first published the pictures with Vargas' signature. However, after the initial contract expired, Esquire began publishing the pictures without giving Vargas credit. Vargas then brought suit seeking an injunction against publication of the pictures without his signature, alleging breach of contract and

F.2d 252 (2d Cir.1955); *see also* 1 Melville B. Nimmer & David Nimmer, Nimmer On Copyright § 5.03B(2)(c) (1993).

unfair competition. The court held that under the terms of the applicable contract, once Vargas delivered the pictures to Esquire he no longer had any rights in the pictures and therefore the pictures were not appropriated unfairly.

*Vargas,* however, was decided prior to the enactment of the Lanham Act. Moreover, in *Vargas,* Esquire, after several years of publishing the artist's pictures with his signature, began publishing his pictures without it. By contrast, in this case, Scott, Foresman, after several years of attributing assistance authorship to Cleary and two other authors, removed Cleary's name and published the 1990 edition with only Robert III's and Evans' names. Consequently, *Vargas* did not consider the precise issue posed in this case: whether a right against *mis*attribution can be found despite a work for hire agreement when the party with whom the Lanham Act plaintiff initially contracted actually gave that plaintiff attribution credit.

■ We need not decide, however, if the Lanham Act grants Dr. Cleary a right against misattribution in the context of this case. Assuming *arguendo* that he originally possessed such a right and did not contract it away through the work for hire agreement, we conclude that it was not violated by Scott, Foresman.

This circuit has established a rigorous test for proving "reverse passing off" under the Lanham Act. It is not enough that the misattributed material is "substantially similar;" instead, there must be "bodily appropriation." *Shaw,* 919 F.2d at 1364. Recently, we reaffirmed this test in *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.,* 7 F.3d 1434, 1438 (9th Cir.1993). In *Summit,* a retailer of industrial lathes brought an action under the Lanham Act against a competitor. The competitor allegedly purchased lathes designed specifically for the plaintiff from the same supplier, and affixed its own name to the product. The plaintiff conceded, however, that identifiable differences between the lathes existed. As in *Shaw,* we held that only in cases of "bodily appropriation" could the reverse passing off doctrine be employed. In support of this conclusion, we noted that the purpose of the Lanham

Act "is to prevent individuals 'from misleading the public by placing their competitors' work forward as their own.' In light of the conceded differences between the lathes, the likelihood the two lathes will be confused is minimal." *Id.* at 1439 (quoting *Shaw,* 919 F.2d at 1364).

While adopting a "bodily appropriation" test in "reverse passing off" cases, we have not provided an exact definition of "bodily appropriation" in those cases. In *Shaw,* we cited *Smith* and *Lamothe* for the proposition that the "reverse passing off" doctrine is limited to two situations:

> Reverse passing off is accomplished "expressly" when the wrongdoer removes the name or trademark on another party's product and sells *that product* under a name chosen by the wrongdoer. "Implied" reverse passing off occurs when the wrongdoer simply removes or otherwise obliterates the name of the manufacturer or source and sells *the product* in an unbranded state.

919 F.2d at 1364 (quoting *Smith,* 648 F.2d at 605 (emphasis added by *Shaw* court)). However, in *Summit,* we recognized that " '[a] defendant may also be guilty of reverse palming off by selling or offering for sale another's product that has been modified slightly and then labelled with a different name.' " 7 F.3d at 1437 (quoting *Roho, Inc. v. Marquis,* 902 F.2d 356, 359 (5th Cir.1990)).

In the copyright context we have defined "bodily appropriation" as the "copying or unauthorized use of substantially the entire item." *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 205 (9th Cir.1989). We consider this definition useful in the Lanham Act context, because, consistent with our decisions in *Shaw* and *Summit,* it recognizes that slight modifications of a product might cause customer confusion, while products which are merely generally similar will not.

While the 1990 edition of *Robert's Rules* is similar in many respects to the 1970 edition, the changes between the editions are not so slight that the 1990 edition can be considered a "bodily appropriation" of the 1970 edition. Cleary correctly argues that "a Lanham Act

Section 43 [claim] can [not] be lawfully defeated by resort to the sprinkling of a few neat sentences here and there or the making of trivial deletions." He then concludes that his "textual work product has been bodily carried over to the so-called new 1990 Edition." Br. at 20. But the evidence establishes that the revisions to the 1990 edition were more significant. The preface to the 1990 edition states that the "text of the previous edition remains intact except where specific revisions or insertions have been made" and then lists 14 "important areas of revision." Further, in a review of the 1990 edition, Bernard Sussman noted:

> There are, however, some additions, and contrary to the usual hype there are also some changes from the rules previously taught. Already a number of parliamentarians have distributed helpful lists of changes, corresponding page numbers, and other notes about the new edition.

E.R., ex. D at 2. In another review, Dr. Greg Phifer carefully delineated all 14 areas of revision and concluded, "Evans and Robert add more explanations, more definitions, more rules to memorize—more of everything." E.R., ex. E at 5.

Viewing the evidence in the light most favorable to Cleary, which must include the reviews of the 1990 edition, we are persuaded that there were, at the least, some major changes between the 1970 and 1990 editions. Even if Cleary completely wrote fifteen of the twenty chapters contained in the 1970 edition as he claims, E.R., tab 36 at 5, the vast majority of the twenty chapters were revised in some way in the 1980 and 1990 editions. Granted some of these revisions involved merely changing words, but many of them involved additional sentences, paragraphs, or pages of explanation, and some changes, although brief, reversed or altered previous rules. These changes would put readers on notice that this new edition is not merely a near verbatim copy of the 1970 edition expanded through a larger print type. Because the 1990 edition is more than a slight modification of the 1970 edition, the district court properly granted summary judgment as to Cleary's Lanham Act claim.[4]

Parenthetically, we note that, even if we were to apply a less demanding "consumer confusion" standard as urged by the appellants and employed by the Second Circuit, among others, Cleary would not prevail. In *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236 (S.D.N.Y.), *aff'd,* 923 F.2d 845 (2d Cir.1990), a case strikingly similar to this one, the plaintiff claimed that the editor of a medical treatise's third edition failed to give proper credit to the author of the treatise's first edition, and had thus engaged in reverse passing off. Denying the claim for injunctive relief, the district court held that the edition's editor had accurately described the author's prior participation in the preface to the new edition, mitigating any possible confusion. The court also emphasized that the work was not a "mass market" book; sophisticated purchasers of reference works are generally aware that "a treatise by definition typically builds upon previous works in the field...." *Id.* at 244.

*Robert's Rules,* like the medical treatise at issue in *Rosenfeld,* is not a "mass market" book. Its audience is apt to be highly sophisticated, and likely to be familiar with earlier editions of the work. Moreover, Cleary's past contribution to the 1970 edition was mentioned accurately, if briefly, in the 1990 introduction. Accordingly, the district court did not err when it granted summary judgment to the defendants on the Lanham Act claim.

B. *California Unfair Competition and California Business and Professions Claims*

This Circuit has consistently held that state common law claims of unfair competi-

---

4. We note that where the plaintiff complains of misattribution of a work that consists solely of revisions to a previous work, the more appropriate approach might be to consider whether the revisions written by the plaintiff were bodily appropriated, instead of whether the work as a whole was a bodily appropriation. Under this approach, the plaintiff would prevail if he could establish that his part of the book was included in the new edition in verbatim or near verbatim form. However, while Cleary stated that he wrote fifteen of the twenty chapters, he never established which chapters he actually did write. In addition, as discussed above, significant changes were made to the majority of chapters, leading us to conclude that the portions of the 1970 edition written exclusively by Cleary were not bodily appropriated.

tion and actions pursuant to California Business and Professions Code § 17200 are "substantially congruent" to claims made under the Lanham Act. *See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.1991) (citing *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1178 (9th Cir.1988) (holding that under both, the "ultimate test" is "whether the public is likely to be deceived or confused by the similarity of the marks") (internal quotations omitted)); *Meta–Film Assocs., Inc. v. MCA, Inc.,* 586 F.Supp. 1346, 1362 (C.D.Cal.1984) (concluding that misappropriation deemed "unfair" under the Lanham Act is also "wrongful" and proscribed under § 17200). For all of the reasons discussed in Part A, *supra,* we hold that the district court properly dismissed these claims.

## C. Breach of Contract Claim

Cleary claims that Scott, Foresman breached its contract when it failed to give him title credit in the 1990 edition of *Robert's Rules.* A viewing of the evidence in the light most favorable to Cleary makes it apparent that, prior to entering into the contract, Scott, Foresman had agreed to give Cleary title page credit. The contract itself, however, does not contain an attribution clause and does not mention named credit.

▮ The parol evidence rule prohibits introduction of extrinsic evidence of a prior or contemporaneous agreement which would vary or contradict the clear and unambiguous language in a contract. *Kendall v. Kendall,* 46 Ill.App.3d 559, 4 Ill.Dec. 867, 869, 360 N.E.2d 1242, 1244 (1977), *aff'd,* 71 Ill.2d 374, 16 Ill.Dec. 938, 375 N.E.2d 1280 (1978).[5] Notwithstanding, if "the language contained in the contract is ambiguous or silent as to essential terms then oral testimony may be properly admitted into evidence." *Farnsworth v. Lamb,* 6 Ill.App.3d 785, 286 N.E.2d 74, 77 (1972). Courts will examine all the

surrounding facts and circumstances of the case to determine if the contract was intended to be the complete and final expression of the parties' intent. *Fuchs & Lang Mfg. Co. v. R.J. Kittredge & Co.,* 242 Ill. 88, 89 N.E. 723, 725 (1909).

▮ Cleary claims that the contract was not a complete and final expression of the parties' intent because the parties intended to give Cleary title credit in the 1970 edition and subsequent reprintings. We note initially that, even if the attribution clause, though not included in the written agreement, could somehow be deemed a material term of the 1965 contract, neither the 1980 nor the 1990 editions were covered by that contract. Cleary apparently attempts to circumvent this hurdle by arguing that the contract ambiguously refers to the term "Work" by not specifying even the general contents of the work, but this argument is undermined by the clear language of the contract. The contract specifically defines the nature of the work, prescribes the number of chapters that Cleary was to produce, and provides for dates of completion. Further, the contract provides, "[O]n any revised edition of the Work, the Publisher shall consider a further retention of the Advisory Editor's services." In using the term "Work," Scott, Foresman clearly was referring exclusively to the work-in-progress which became the 1970 edition of *Robert's Rules.*

▮ Notwithstanding, even if we were to conclude that the terms of the 1965 contract applied to the 1980 edition and subsequent editions, we are unpersuaded by Cleary's attempts to prove that the contract was ambiguous as to a material term. Oral testimony may be introduced if the language in the contract is silent as to a material term. *Farnsworth,* 6 Ill.App.3d 785, 286 N.E.2d at 77. Yet, according to Cleary's own testimony, he knew there was no provision granting him credit, *see* E.R., ex. E at 235, yet he signed the contract anyway.[6] At his deposi-

---

5. Cleary's breach of contract claim is governed by Illinois law under the terms of the contract.

6. We note that Cleary was not represented by an attorney during contract negotiations and that the contract was a standard boilerplate contract. However, Cleary did review the agreement and,

by letter, requested some changes in the terms and wording of the contract. E.R., ex. K at 139. Of particular interest, Cleary successfully requested an increase in the proposed royalty and raised several specific questions regarding the payment of royalties on future editions, inquiries

tion, Cleary testified that at the time the contract was signed "it was not important that there be name credit, but it became in my mind more and more important as my involvement grew and grew by considerable degrees over the period of the ensuing years." E.R., ex. E at 235–36. Even viewed in the light most favorable to Cleary, these facts indicate that he did not consider an attribution clause an essential term of the contract. Cleary was aware that the term was not in the contract and did not consider it important at the time. Therefore, oral testimony may not be used to introduce that term into the contract.

 Cleary also argues that the parties implicitly intended to grant him a right to name credit. This hidden meaning is established, Cleary asserts, by the fact that in prior editions, *Robert's Rules* was published with title credit given to contributing authors. We find this argument unpersuasive. The contract does not mention name credit in any manner, and thus is not ambiguous on its face. In addition, we have already noted that under a valid work for hire arrangement, a publisher is under no obligation to provide attribution, unless such a right has been specifically reserved in the contract. *Vargas v. Esquire, Inc.,* 164 F.2d 522, 526 (7th Cir.1947). In its contract, Scott, Foresman included a work for hire clause and did not include an attribution clause. From this, it is fair to conclude that Scott, Foresman did not intend to contract to give Cleary name credit. To now introduce an attribution clause would be to introduce a term which would contradict the clear language of the contract.

 Finally, Cleary argues that the defendant's subsequent acts of attributing authorship to Cleary in the 1970 and 1980 editions evince a contractual understanding that name credit would be provided. Subsequent conduct of the parties may be considered when it does not contradict the plain meaning of the contract. *Board of Trade v. Dow Jones & Co.,* 108 Ill.App.3d 681, 64 Ill.Dec. 275, 281, 439 N.E.2d 526, 532 (1982), *aff'd,* 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983). Because Cleary relinquished authorship as well as copyright ownership when he signed the work for hire provision, subsequent conduct and circumstances indicating an intent to provide attribution are in direct conflict with the work for hire agreement and cannot be considered. Evidence of Scott, Foresman's subsequent acts of attribution only indicates that they were complying with their previous representation that they would include his name even though they were under no contractual duty to do so.[7] At the time of contracting, Cleary could have insisted that the agreement contain an attribution clause for the 1970 and subsequent editions; he then could have enforced that contractual right had Scott, Foresman failed to give him name credit.

Accordingly, because the plaintiff seeks to introduce extrinsic evidence which would vary the unambiguous language of the contract, we conclude that the trial court properly granted summary judgment to the defendants with respect to Cleary's breach of contract claims.

D. *Intentional Infliction of Emotional Distress Claims*

Cleary argues that the claim of intentional infliction of emotional distress is "intensely factual" and he is therefore entitled to a trial on this issue.[8] In his brief, he notes that Scott, Foresman deleted his name unilateral-

---

which appear to have been addressed in the final agreement. In this letter, Cleary did not mention the issue of title credit.

7. Alternatively, Johnson's testimony indicates that Cleary's name was valuable to Scott, Foresman. Therefore, Scott, Foresman may have given Cleary title page credit for entirely selfish reasons. While it may seem unfair that Scott, Foresman could use Cleary's name for as long as they wanted to and then stop giving him name credit, the Lanham Act might restrict their ability

to do so, as we discussed previously in Part A, *supra.*

8. Cleary did not address the issue of *negligent* infliction of emotional distress on appeal and therefore we may consider this claim waived. We note that even if he had addressed this claim, his arguments would have been unavailing because, as with his other emotional distress claims, he would have failed to establish an essential element of that tort, *i.e.,* severe emotional distress.

ly and without notice to him. He further claims that Scott, Foresman failed to make a bona fide attempt to determine whether his name could be deleted at their discretion.

Before addressing the substantive issues, we first note that California law governs Cleary's emotional distress claim. A district court in diversity jurisdiction must apply the law of the forum state to determine the choice of law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Waggoner v. Snow, Becker, Kroll, Klaris & Kruass*, 991 F.2d 1501, 1506 (9th Cir.1993). California uses the "governmental interest" test to determine the choice of law. *Waggoner*, 991 F.2d at 1506. Under the first step of this test, we must determine whether a true conflict exists between the laws of the jurisdictions present in the litigation; a true conflict exists only if the laws of the jurisdictions differ and both states have a legitimate interest in applying their law. *Id.* While this test has two prongs, *see id.*, we need only consider the first prong to determine that California law applies, for the elements of intentional infliction of emotional distress are virtually identical under California and Illinois law. *Compare Standard Wire & Cable Co. v. AmeriTrust Corp.*, 697 F.Supp. 368, 372 (C.D.Cal.1988) *with Public Fin. Corp. v. Davis*, 66 Ill.2d 85, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976).

The tort of intentional infliction of emotional distress requires a showing of outrageous conduct resulting in severe emotional distress. *See Standard Wire & Cable*, 697 F.Supp. at 369. Cleary has failed to produce sufficient evidence establishing either outrageous conduct, severe distress or, for that matter, any other element of this cause of action. Thus, the District Court properly granted summary judgment on this issue.

## CONCLUSION

Viewing the evidence in the light most favorable to Cleary, we conclude that no genuine issues of fact remain on any of his claims. Thus, the district court properly granted summary judgment as to all counts of Cleary's amended complaint and the decision of the district court is AFFIRMED.

**AFFIRMED.**