### TWENTIETH CENTURY–FOX FILM CORPORATION v. STONESIFER.

#### No. 10399.

Circuit Court of Appeals, Ninth Circuit.

Feb. 10, 1944.

580

Alfred Wright and Gordon Hall, Jr., both of Los Angeles, Cal., for appellant.

Arthur V. Kaufman and Harry H. Licker, both of Los Angeles, Cal., for appellee.

Before WILBUR and STEPHENS, Circuit Judges, and McCORMICK, District Judge.

McCORMICK, District Judge.

This is an appeal by Twentieth Century-Fox Film Corporation from a judgment in the District Court awarding appellee damages in the sum of $3,960, attorney's fees and costs arising out of copyright infringement of appellee's dramatic composition "Women's Hotel" by appellant's motion picture production entitled "Hotel for Women."

The record reveals that appellee, a playwright, while living at the Allerton House, a women's hotel in New York City, originated and composed a play entitled "Women's Hotel," which she subsequently duly copyrighted. The characters in the play were drawn from people that the author knew in Allerton House. In addition to her work as a writer, appellee operated a theatre in New York City known as the Villa Venice, where she exhibited her original plays and those of other authors. Here, in July, 1937, before an invited audience appellee produced her play "Women's Hotel." Among those invited and present at the performance was one Frank Underwood, appellant's associate story editor. At the conclusion of the play Underwood told appellee that he was interested in the composition and he requested that she submit to him a copy of the play. During the same week appellee sent a copy as requested. Inquiring of Underwood a few weeks later whether he had finished with the copy, appellee was informed by him that the copy "was out at the coast." Several weeks later appellee sent her stage manager to Underwood's office and the play was returned. In the month of August, 1939, appellant produced and exhibited its sound motion picture "Hotel for Women."

Darryl F. Zanuck, vice president in charge of production of appellant and of the selection or rejection of story material suitable for motion picture production by appellant, testified that the idea of producing "Hotel for Women" came from one Silverman, president of a Chicago film distributing agency. Along in the summer of the year 1938, according to Zanuck's testimony, he dispatched a staff writer to New York City with instructions to live at the Barbazon Hotel, a hotel for women, and gather material suitable for the production. The writer testified that she had carried out these instructions but denied that she had discussed with one Moscovitz, Underwood's superior in the story department of appellant, the plot of the play "Women's Hotel," although admittedly she had visited the office of the story editor of the appellant company two or three times and had discussed her mission to New York with Moscovitz. Upon the staff writer's return to Los Angeles, according to the testimony of appellant's witnesses, other staff members also contributed to the ultimate scenario which was filmed as "Elsa Maxwell's Hotel for Women."

Before considering applicable legal questions in this appeal a summation of appellee's dramatic composition and appellant's motion picture is appropriate. The play "Women's Hotel" centers around the principal character, Margaret Ross, a small-town girl from Illinois, who arrives in New York City to study designing. The other principal characters are: Irene Marsh, an actress, frank, wise to the ways of the world, and with a slightly tarnished reputation; Lillian Forbes, also an actress, but presently unemployed, living frugally and making sacrifices for her "friend," Trevor; Anna Kutner, a model, seeking to pose for a cigaret advertisement; Joe Braley, a roué, with whom Margaret is trustingly indiscreet; Sue and Caroline, mannishly dressed women, and divers other characters, such as spinsters, women clerks, a doorman, waiters, bellboys—personalities found about a hotel exclusively for women.

The play opens in the lobby of the hotel as Margaret, accompanied by her father to see that she receives proper accommodations, checks in. After cautioning her with concerned fatherly advice, Mr. Ross draws a map of the hotel's environs that Margaret may more readily become accustomed to the locality. Margaret proceeds to establish herself at the hotel and there be-

comes acquainted with the various girls. As the play proceeds she meets actresses, models and lonely girls, all of varying moral attitudes, and with all the principal topic of conversation is men. Through an actress friend Margaret meets Joe Braley, with whom she falls in love and who quite willingly helps Margaret to forget her father's admonitions. Convinced by Braley that it is not improper to visit his apartment alone, she does so and there he proceeds to weaken her resistance. While the two are in the apartment the tete-a-tete is interrupted by the telephone. Braley, trying to allay Margaret's suspicions, and those of a cast-off paramour who is telephoning, unsuccessfully attempts to disguise the conversation; but the jealous woman, not to be supplanted, hastens to the apartment, and confirming her suspicion of the pair's intimacy, fires a shot at Margaret. Margaret, not seriously wounded, returns to the hotel, but her reputation is impaired by adverse newspaper publicity. At the play's conclusion her parents arrive at the hotel to take her home, and as the curtain falls on the drama, Margaret exits in melodramatic fashion.

In appellant's motion picture production Marcia Bromley, a small-town girl from upper New York State, comes to New York City to seek and be near her home town sweetheart, Jeff Buchanan. She registers at the Sherrington Hotel for Women. A map is flashed on the screen depicting the hotel's environs. Other principal characters in the film are: Eileen Connelly, an actress; Nancy Prescott, a model, and making sacrifices for the man she loves; Barbara Hunter, a model, cast off by John Craig, Jeff's employer and a wealthy man about town who sets out to ensnarl Marcia's affections, and Jeff Buchanan, whose love for Marcia has diminished since his success as a young architect in New York City.

The motion picture begins by showing Marcia just arriving, registering at the hotel, and telephoning Jeff, who is confused and surprised to learn she is in town. However he makes an engagement with her, which results in her knowledge that Jeff's affection for her has cooled. Marcia resolves to return home, but Eileen, in need of an extra girl to constitute a foursome for a blind date, persuades Marcia to join

them, and lends her a dress for the occasion. The four go to a night club, where Marcia again meets Jeff, who is disturbed at her attractiveness. At Eileen's suggestion Marcia becomes interested in modeling and is chosen in preference to Barbara to pose for a series of Cambridge cigarette advertisements. Meeting with instantaneous success, she is admired, photographed and sought after, to the discomfort of Jeff, whose affections have become rekindled. Among Marcia's admirers is John Craig, with whom Barbara has been too friendly in the past. Marcia, invited by Craig to his apartment, imprudently goes, and is surprised to find herself alone with him. After dinner he makes advances in his sophisticated way and implies that she will be rewarded for her submission to him. Marcia adroitly parries his suggestions. In the midst of this situation, Barbara, who had previously telephoned and had been informed by Craig that he was in conference, enters the apartment, confirms her suspicion of Craig's deception, and in a fit of jealous rage fires a pistol at Craig. Barbara then disappears and Marcia is accused of the crime. Jeff appears and takes the blame until Craig clears the situation by stating the shooting was an accident. Marcia, because of her part in the affair, becomes the subject of notoriety and is no longer wanted by the modeling agency. She and Jeff are reunited and leave the hotel in each other's arms.

■ The Copyright Act[1] provides that "Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right (a) to print, reprint, publish, copy, and vend the copyrighted work." It is obvious from the foregoing statements of the play and the motion picture that there are similarities between the two works, but as there can be no infringement of copyright without some copying, the mere fact of similarity between two works does not of itself make one an infringement of the other.[2]

Appellant's principal attack in this appeal is upon the findings of the court below which epitomized are that unlawful copying and appropriation of material and substantial portions of appellee's copyrighted play "Women's Hotel" has been established as against Twentieth Century-Fox Film Corporation.

---

[1] Act, March 4, 1909, c. 320, §§ 1 and 64, 35 Stat. 1075, 1088, 17 U.S.C.A. § 1.

[2] See Harold Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d 1.

We must of course take into consideration the fact that the trial judge was in a more advantageous position than is this court to determine the credibility of witnesses who testified to the submission of the copyrighted play to the appellant's story editor's office and to retention of the play by appellant's agent prior to the making of the accused motion picture; and, likewise, we must consider the trial judge's better position to weigh the effect of evidence of a performance of appellee's play upon one Underwood, who, as representative of the appellant corporation, witnessed the play's one presentation.

■ The findings of the District Judge, notwithstanding the absence of direct evidence of copying are, we think, tantamount to a determination by the court below of access by the appellant to the copyrighted matter before production of "Hotel for Women" commenced. This, with the palpable and significant similarities between the play and the motion picture amply justify the conclusion of infringement.

■ In copyright infringement cases involving original dramatic compositions and motion picture productions, inasmuch as literal or complete appropriation of the protected property rarely occurs, the problem before the court is concrete and specific in each case to determine from all the facts and circumstances in evidence whether there has been a substantial taking from an original and copyrighted property, and therefore an unfair use of the protected work.[3] Complete absence of discernible similarities or identities between the copyrighted literary work and the asserted infringing photoplay is not essential to overcome the charge of actionable copying, but it is also well established that proscribed copying cannot be evaded by immaterial variations in the cinema of text or treatment.[4]

■ The two works involved in this appeal should be considered and tested, not hypercritically or with meticulous scrutiny, but by the observations and impressions of the average reasonable reader and spectator.[5]

Applying such principles of admeasurement, and having had the opportunity to read appellee's play "Women's Hotel" and, in the presence of counsel for the respective parties to this appeal, having witnessed an exhibition of appellant's motion picture "Hotel for Women," we find and conclude, as did the court below, that the numerous striking similarities in the two works can not in the light of all the evidence be said to constitute mere chance. The deduction of material and substantial unlawful copying of appellee's original play in appellant's motion picture is more in consonance with the record and with the probabilities of the situation therein disclosed.

In both appellee's dramatic composition and in appellant's motion picture the principal characters, Margaret and Marcia, are unsophisticated young ladies who go to New York City and register at a hotel for women. Margaret came from a small town in Illinois; Marcia came from Syracuse, New York. Each becomes involved with older men who attempt to take advantage of their inexperience. In both the climax is reached in the respective apartments of these men when a jealous woman, who had a short time previously called by telephone and was deceived, enters the apartment and fires a pistol.

Each work under consideration has a singularity of locale, setting, action and dialogue. Appellee's play consists of three acts and four scenes. Act I takes place in the lobby of the Hotel for Women. Act II is laid in the hotel room of Irene, the actress, and Scene 2 of Act II takes place in Joe Braley's apartment. Act III occurs in a reception room of the lobby of the hotel. In appellant's photoplay the principal scenes are likewise laid in the lobby of the hotel; in the room of Eileen, the actress; in the apartment of John Craig; and, finally, in the lobby of the hotel.

In both the play and the motion picture the hotel's vicinity is similarly indicated by a map; in the play Margaret's father draws a map for Margaret; in the motion picture a map is thrown upon the screen. The opening scenes of each reveal a doorman, bell boys, women clerks and ladies passing to and fro in the respective lobbies, entrances, and to the elevators. As Margaret in the play registers she is informed by the hotel clerk that "There is no one

---

[3] Nichols v. Universal Pictures Corp., 2 Cir., 45 F.2d 119.

[4] See Nichols v. Universal Pictures Corp., supra.

[5] Kustoff v. Chaplin, 9 Cir., 120 F.2d 551; Harold Lloyd Corp. v. Witwer, supra; Dymow v. Bolton et al., 2 Cir., 11 F.2d 690; King Features Syndicate v. Fleischer et al., 2 Cir., 299 F. 533.

here to show you the room. Will you have a seat?" Marcia in appellant's film is informed by the clerk that her room is not yet ready and she is compelled to wait. In each the wait is imposed upon the principal character to create a proper setting for the introduction of other characters. In each there is an interruption by an elderly lady complaining of the hotel service. In appellee's play Miss Frazer complains; in the film Mrs. Fletcher. While waiting for their rooms both Marcia and Margaret declare that they do not smoke. When a model passes through the lobby Margaret exclaims, "Isn't she stunning!" Similarly, appellant's Marcia when she sees a model pass in the lobby exclaims "Whew! She's stunning!"

In the film and in Act II of appellee's play the arrangement of the bedrooms is strikingly similar. In the play the room is Irene's; in the film, Eileen's; both actresses are alike in character. Each room is in similar disarray, and in both most of the girls are scantily clad. In each a girl is ironing. In each, one of the girls states that she has a date with a producer and has a part in his play. In both the play and in the film blind dates are arranged with wealthy playboys for appellee's Lillian or appellant's Marcia. In each Eileen or Irene informs the girl she may wear her clothes for the occasion, and in each the arrangement of the girl's hair for the date is a topic of conversation. In each the girl is surprised and pleased at her appearance.

In the play Margaret refers to Joe as "one of the nicest men I have ever met," and in the film Marcia refers to John as a "most charming, intelligent and entertaining man." In each a girl complains of her lover's lack of interest, and in each, Irene or Eileen gives the girl some philosophical advice. Irene in appellee's play on an occasion states that the girls might as well have their meals bought for them. In appellant's film Eileen informs the girls that no young lady in New York should pay for her own dinner. In the play, Ann, the model, while in Irene's room states that she may soon pose for a cigaret advertisement. The telephone rings at that moment and she is informed the contract is ready for her signature. In the film Marcia discusses with the girls her new experience in attempting to become a model. Similarly the telephone rings and she is informed that she has been selected to pose for a Cambridge cigaret advertisement. In the play Irene is worried for fear she is appearing thinner in the face; appellant's Joan is likewise worried.

In appellant's play Joe Braley finally persuades Margaret to come to his apartment alone; John Craig in the motion picture persuades Marcia to do likewise. In each drinks are poured for the girl, and in each overtures are made. In both a jealous woman not to be put off by previous deceptive telephone calls frustrates the situation and fires a pistol, slightly wounding one of the romancers. In both the scandal is given considerable derogatory newspaper publicity, resulting in the disrepute of the principal character.

In the concluding scenes of the film and the last act of the play Marcia and Margaret are about to leave the hotel; Margaret in disgrace; Marcia's career ruined by public opinion. Marcia, however, leaves the hotel in the arms of Jeff, but Margaret as the curtain lowers, exits in a melancholy and melodramatic fashion.

In each version there are minor scenes characterized by gossipy and envious women who delight in half-veiled remarks; lonely girls; paid escorts, racy conversations; dogs on leashes, and like incidents tending to further warrant the findings and conclusions that the copyrighted play was utilized in a substantial way in the motion picture "Hotel for Women."

It is true, as appellant argues, that the film and appellee's composition differ in numerous respects. Such dissimilarities result, however, principally from the film's enlarged means to express in a wider latitude incidents necessarily requiring a wider range of settings than a play restricted to the narrow confines of a theatrical stage is able to present.

Appellant finally contends that there is no evidence whatsoever to sustain the findings of damages or the conclusion based thereon. The record reveals that considerable trial time in the court below was consumed in the determination of the film's approximate total cost. It appears that this, including costs of production, prints and distribution, amounted to $842,400, and that the film rentals amounted to $862,200, or a net profit of $19,800. From this the trial court assessed damages for the infringement of $3,960, or one-fifth of the net profits.

It is now settled that where a portion of the profits of an infringing work is attributable to the appropriated work, to avoid an unjust course by giving the originator all profits where the infringer's labor and artistry have also to an extent contributed to the ultimate result, there may be a reasonable approximation and apportionment by the court of the profits derived therefrom.[6] We find no reason to disturb the award of damages or the allowance of attorney's fees [7] in the court below.

Affirmed.

---

[6] Sheldon et al. v. Metro-Goldwyn Pictures Corporation et al., 2 Cir., 106 F. 2d 45, affirmed 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825. See, also, Sammons et al. v. Colonial Press, Inc., et al., 1 Cir., 126 F.2d 341.

[7] Title 17, sec. 40, U.S.C.A. Burndy Engineering Co. v. Sheldon Service Corp., 2 Cir., 127 F.2d 661.