Judy STABILE, Plaintiff,

v.

PAUL SMITH LIMITED; Paul Smith Los Angeles, LLC; The Rug Company Limited; The Rug Company, Ltd. (CA), Defendants.

Case No. CV 14–3749 DMG (SHx)

United States District Court, C.D. California.

Signed July 31, 2015

Marc Karish, A. Eric Bjorgum, Karish and Bjorgum PC, Pasadena, CA, for Plaintiff.

George Gottlieb, Jonathan M. Purow, Gottlieb Rackman and Reisman PC, New York, NY, Mark D. Kremer, Zachary T. Page, Conkle Kremer and Engel PLC, Santa Monica, CA, for Defendants.

## ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION [35]

DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

## I.

## PROCEDURAL BACKGROUND

On May 15, 2014, Plaintiff Judy Stabile filed a Complaint against Defendants Paul Smith Limited, Paul Smith Los Angeles, LLC, The Rug Company Limited, and the Rug Company, LTD. (CA) alleging (1) copyright infringement; (2) vicarious copyright infringement; and (3) contributory copyright infringement. [Doc. # 1.]

On May 1, 2015, Defendants filed a motion for summary judgment for non-infringement of Stabile's allegedly copied paintings or, in the alternative, summary adjudication of the facts and conclusions set forth in Defendants' [Proposed] Statement of Uncontroverted Facts and Conclusions of Law ("MSJ"). [Doc. # 35.] On May 29, 2015, Stabile filed an opposition ("Opp."). [Doc. # 41.][1] On June 12, 2015, Defendants filed a reply ("Reply"). [Doc. # 50.]

## II.

## FACTUAL BACKGROUND [2]

### A. The Parties

Judy Stabile is an abstract artist based in Los Angeles, California who has been a professional artist since 1973. Defendants' Reply Statement of Facts and Conclusions of Law in Support of Defendants' Motion for Summary Judgment ("Reply SUF") ¶¶ 17, 88. [Doc. # 50–1.] Stabile registered three of her "Cylinder" paintings with the U.S. Copyright Office in 2014: Extrapolations # 3 (created in 1982), Extrapolations # 1 (created in 1981), and Westside Story (created in 2006). (Id. ¶¶ 18, 95.) Extrapolations # 3 is the subject of this lawsuit. (Id. ¶ 18)[3]

---

1. On June 1, 2015, Stabile filed a Notice of Errata correcting her Opposition. [Doc. # 46.] On June 3, 2015, Defendants filed an objection to the Errata. [Doc. # 49.] Defendants note in their objection that the originally filed Opposition brief appeared to be an incomplete draft, which included numerous references to exhibits without specifying an exhibit number, featured a "Conclusion" section with no accompanying text, and did not include the section "There are Sufficient Facts to Create An Issue Regarding Access" which appeared in the amended Opposition. Due to the strong preference of the federal courts for resolution of claims on the merits, the Court overrules the objection to the amended Opposition included in the Notice of Errata. *See Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 550, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010). Nonetheless, Plaintiffs are strongly admonished not to attempt an end-run around court deadlines by filing an incomplete draft and later substantially revising and supplementing it.

2. The Court sets forth the material facts, which are uncontroverted except where indicated. The Court responds to objections to evidence only where such evidence is relied upon in the Court's ruling.

3. In their Reply, Defendants correctly point out that Plaintiff initially asserted two additional works as the basis for her infringement

Paul Smith Limited ("Paul Smith") is a United Kingdom entity headquartered in London and Nottingham, England. (*Id.* 2.) Paul Smith products are manufactured, sold, and distributed throughout the world. (*Id.* ¶ 3.) Paul Smith is a wholly owned subsidiary of Paul Smith Group Holdings. (*Id.* ¶ 6.) Paul Smith is the owner of the U.S. copyright registration for the design "Carnival" registered on January 23, 2012. (*Id.* ¶ 5.)

Paul Smith Los Angeles LLC is a California limited liability company with its principal place of business in Los Angeles, California and is also a wholly owned subsidiary of Paul Smith Group Holdings. (*Id.* ¶¶ 7–8.) Paul Smith Los Angeles LLC is one of the retail locations operated by Paul Smith. (*Id.* ¶ 9.)

The Rug Company Limited is a United Kingdom entity with its principal place of business in London, England. (*Id.* 10.) The Rug Company Limited is a manufacturer of high fashion, luxury rugs, and related home accessories. (*Id.* ¶ 11.) Like Paul Smith, it conducts business throughout most major commercial cities in the world. (*Id.*)

The Rug Company Ltd. (CA) is a California corporation and an affiliate of The Rug Company Limited (collectively "The Rug Company"). (*Id.* ¶¶ 12–13.) The Rug Company has had a significant business relationship with Paul Smith for over fifteen years. (*Id.* ¶ 14.) The Rug Company is the exclusive licensee of the "Carnival" design, and markets rugs with this design internationally, including at its retail store in Los Angeles, California. (*Id.* ¶¶ 15–16.)

## B. Extrapolations # 3

Stabile created the painting Extrapolations # 3 [4] in 1982. (Reply SUF ¶ 95.) The original work is approximately 45″ × 33″ (*Id.* ¶ 96.) Extrapolations # 3 was displayed in the California restaurants Spago in Hollywood and Spago in Beverly Hills for approximately fifteen years before being sold to a private collector around 2003. (*Id.* ¶¶ 51, 96.) A large print of the painting (78″ × 43″) was installed in Hal's Restaurant in Venice, California in 2003, and an image of the painting has appeared on the front cover of Hal's menu since 2003. (*Id.* ¶¶ 51, 97.)

action, and did not clarify, until the summary judgment stage, that she now asserts only infringement of Extrapolations # 3. Reply at 1–2. While Defendants assert that this created an "enormous waste of time and effort," they do not appear to object to this narrowing of the issues. *Id.* at 2. Thus, the Court will assess only the question of the alleged infringement of Extrapolations # 3.

**4.** Stabile has lodged several physical exhibits with the Court representing Extrapolations # 3, including a mounted "full-size" print and a cardstock print. [Doc. # 60.] Defendants object to the filing of these exhibits on the basis that they are copies, rather than originals, and there is no guarantee that the scan or the accompanying print accurately reproduced the color or dimensions of the original work. [Doc. 64.] Stabile need not produce evidence in a form that would be admissible at trial as long as the evidence bears sufficient

guarantees of trustworthiness. *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir.1991) ("the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.") (internal quotation marks and citation omitted). The prints of Extrapolation # 3 are admissible for summary judgment purposes.

Defendants generally object to the representation of both Extrapolations # 3 and the Carnival Rug in the Expert Report of Mumsey Nemiroff ("Nemiroff Report") submitted in support of Plaintiff's Opposition. (MSJ Reply at 3-5.) Defendants maintain that the images used in the Nemiroff Report and presented by Stabile elsewhere are significantly manipulated and distorted. (*Id.*; Reply SUF ¶¶ 102–106.) For purposes of this summary judgment motion, the Court primarily examines the actual physical exhibits lodged and each party's representation of its own designs.

Approximately 18 prints of Extrapolations # 3 have been made in various sizes. (*Id.* ¶¶ 53, 97.) One of those prints was sold to someone in London. (*Id.* ¶ 97.) Stabile is not sure where the other prints were sold or where they are now. (*Id.* ¶¶ 53, 97.)

Stabile stated during her January 13, 2015 deposition that Extrapolations # 3 has appeared on her website, but she could not remember when it appeared, and it does not appear there now. (Stabile Depo. 108:24–109:6.) Stabile states in her decla-

ration that the website launched in 2007. (Stabile Decl. ¶ 4.) Defendants have used the "Wayback Machine"[5] to capture stored screen shots of Stabile's website from 2001[6] to 2011. (Purow Decl. ¶¶ 11–15.) Extrapolations # 3 does not appear on any of these archived URLs. (*Id.* ¶ 16.) On June 6, 2015, Defendants' counsel found a single marketplace listing for a work entitled Extrapolations # 3 on the One Kings Lane website. (*Id.* ¶ 18.)

The following is a copy of Stabile's Extrapolations # 3:

Stabile objects to this evidence as unduly prejudicial, because neither Butler nor the Internet Archive was identified in any disclosures, and they were known before Plaintiff's opposition was filed. (Evidentiary Objections to Declaration of Jonathan Purow ¶ 2 [Doc. # 61.]) Stabile also objects on the ground that the Internet pages shown are not the full captures of the website, but only isolated pages. (*Id.*) The captures from the Wayback Machine will not be considered conclusive evidence of what was or was not on Stabile's entire website between 2001 and 2011, but will be admitted as support for the contention that there is no evidence beyond Stabile's deposition statement that Extrapolations # 3 was displayed on her website at all, and that there is no evidence that it was displayed during the relevant time period.

6. There are conflicting statements and evidence regarding the timing of the launch of the website and the display of Extrapolations # 3 on the website.

5. The Wayback Machine uses software programs known as crawlers that store copies of website files at specific URLs as they exist at the time of capture. (Prurow Decl. ¶ 13 [Doc. # 50–2].) Each archived file has in the footer of its printout page a URL that catalogues the time and date of capture of a page of the website. (*Id.*) Defendants have attached an affidavit from Christopher Butler, Office Managers at the Internet Archive located in San Francisco, California describing the function of the Wayback Machine. Defs.' Ex. 184 [Doc. # 50–3.] *See Telewizja Polska USA, Inc: v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 2367740, at *6 (N.D.Ill. Oct. 15, 2004) (affidavit verifying that Internet Archive Company retrieves copies of website as it appears on dates in question from its electronic archives is sufficient to satisfy Rule 901's threshold requirement for admissibility); *see also Syncsort Inc. v. Innovative Routines Int'l, Inc.*, No. CIVA 04–3623 (WHW), 2008 WL 1925304, at *5 (D.N.J. Apr. 30, 2008); *Allen v. Ghoulish Gallery*, No. 06CV371 NLS, 2007 WL 4207923, at *3 (S.D.Cal. Nov. 20, 2007).

Judy Stabile, Extrapolations # 3 (1982), Stabile Decl., Ex. A [Doc. # 41–1].

## C. The Paul Smith Design Process

Paul Smith's "Multi Stripe" design was created in 1996 and used on menswear and accessories. (Reply SUF ¶ 20.) As its popularity increased, it was·used on cloth-ing, bags, accessories, rugs,. and stationary, and has been sold continuously throughout the world since that time. (*Id.*; *see also* Defs.' Ex. 168 [Doc. # 35–4] (showing colorful striped patterns on Paul Smith scarves, belts, mugs, key chains, and purses)).

The following is a representation of Paul Smith's "Multi Stripe" design:

*Paul Smith, Multi Stripe Design (1996), Defs.' Ex. 155 [Doc. # 35–2].*

Paul Smith directs and supervises his company's designers and designs. (Reply SUF ¶ 22.) In 2008, the Paul Smith Print Department in London created an "inspiration board" that collected all of the items to be used as an inspiration for that season's prints. (*Id.* ¶ 26.) In late 2008, the Paul Smith Print Department met with Smith to review the inspiration board before preparing actual designs. (*Id.* ¶ 27.) Smith provided the Print Department with a letter written on stationary he had purchased at Pandolfini Casa d'Aste in Florence, Italy which featured colorful wide stripes aligned in different directions on its left and right sides. (*Id.* ¶ 28.) [7] The letter was added to the inspiration board. (*Id.*) During this meeting, Smith noted that he particularly liked another item on the inspiration board—a photograph of a swatch of fabric featuring transparent intersecting colored lines. (*Id.* ¶ 30). He stated that the photograph reminded him of the 2008 Christmas season window display at the Paul Smith jeans store, which also featured overlapping transparent lines of different colors. (*Id.*) Smith instructed the Print Department to visit the Paul Smith jeans store and use the window display as inspiration. (*Id.* ¶ 32.) The Paul Smith Nottingham store featured similar window displays with overlapping transparent lines of different colors for the 2008 Christmas season. (*Id.* ¶ 33.)

---

7. Stabile objects to this fact in the Gillespie Declaration for lack of foundation. Evidentiary Objections to Niamh Gillespie Declaration at No. 2. [Doc. # 39.] Smith attests to this fact in his declaration, and he has the requisite personal knowledge of this fact. Declaration of Paul Smith ("Smith Decl.") at ¶ 5. [Doc. # 35–2.] The letter is also attached as an exhibit. (Defs.' Ex. 155. [Doc. # 35–3.]) Stabile's objection is OVERRULED.

## D. The Carnival Rug

Niamh Gillespie was the primary designer responsible for creating a colored stripe design that was ultimately called "Carnival." (*Id.* ¶ 36.) Monach Brittain supervised the creation of all designs during the fashion season that Carnival was created. (*Id.* ¶ 37.) Neither Gillespie nor Brittain has ever visited Los Angeles or Beverly Hills. (*Id.* ¶ 52.) Gillespie and Brittain assert that they have never visited Stabile's website. (*Id.* ¶ 66.) Stabile responds that "[it] is impossible for Defendants' employees to remember every website they have ever visited," but presents no evidence to contradict their assertion or to pinpoint the period in time when an image of Extrapolations # 3 appeared on her website. (*Id.*)

In January of 2009, Gillespie created numerous drafts of a design of colorful horizontal stripes stacked in vertical rows, first with felt tip markers, then watercolors, then using Photoshop to further alter the design. (*Id.* ¶¶ 38–46.) A record of each step of the design process for "Carnival" was contemporaneously entered into the Paul Smith design database. (*Id.* ¶ 47.)[8] The final version of the design was sent to The Rug Company Limited so that it could be utilized as the design on a rug that ultimately became the Carnival Rug. (*Id.* ¶ 48.) The Rug Company manufactured and sold the Carnival Rug worldwide, including at its Los Angeles store. (*Id.* ¶ 50.)

A copy of Paul Smith's Carnival Rug is shown below:

*Paul Smith, Carnival Rug (2009), Defs.' Ex. 180 [Doc. # 35–4].*[9]

8. Stabile disputes this fact, stating that "[b]etween December 2008 and mid-January, 2009, 'Carnival' began to look like Stabile's work." (Reply. SUF ¶ 47.) This does not create a dispute as to the fact that records of Gillespie's drafts were entered into the Paul Smith design database as they were created.

Defendants have attached numerous drafts of designs featuring stacked colored lines that Gillespie states in her declaration she created in January 2009. (Defs.' Exhibits 161–166 [Doc. # 35–3.])

9. Defendants have also lodged a 9' x 6' version of the Carnival Rug with the Court,

In 2008, Paul Smith had a policy limiting access to the Internet at work for its designers. (Reply SUF ¶ 69; Gillespie Depo. at 14:8–15:1 [Doc. # 59–1] ). Gillespie used the Internet at home in 2008. (*Id.* ¶ 69; Gillespie Depo at 16:5–14.) There was no rule in 2008 that would have prevented Paul Smith designers from using the Internet on their own time and finding images that inspired subsequent designs without reporting this Internet use. (Gillespie Depo. at 16:8–14.)

### E. Expert Reports

Both parties have submitted expert reports and declarations. Stabile has submitted the Declaration and Expert Report of Mumsey Nemiroff ("Nemiroff Report") in support of her Opposition. [Doc. # 65.][10] Paul Smith has submitted the Declaration and Expert Report of Denise Mullen ("Mullen Decl.") and the Declaration and Rebuttal Expert Report of Denise Mullen ("Mullen Rebuttal") in support of its MSJ. [Doc. ## 35–2, 50–2.]

In her Declaration, Mullen provides her opinion of the characteristic elements of both the Stabile cylinder paintings and the Paul Smith rug, and key differences between them:

> The Stabile cylinder paintings appear to be representations of growing forms in a landscape, or an abstraction from nature.... The cylinders suggest reeds or stems in a space close to the viewer against an atmospheric background ...

which the Court has considered rather than the photographs of the rug. [Doc. # 57.] *See also* n. 4, *supra.*

**10.** While both the Purow Declaration and the Mullen Rebuttal address the alleged inaccuracy and incompleteness of the representation of both works in the exhibits attached to the Nemiroff Report, Defendants do not appear to object to the admissibility of the Report itself. While the partial representations of the works in the digital images portrayed in Exhibit A of the Nemiroff Report could potentially create a

of a softly modulated far distance. The cylinders are shaded to create the illusion of three-dimensional form.... The result is a grouping of distinct, yet overlapping cylinders cropped top and bottom positioned in the space of the painting against a far distance. The emphasis is on the solid, opaque, 3–D forms in the foreground, each of which retains its distinct shape standing in sharp contrast to the softly modulated, atmospheric far distance. Thus two separate and distinct planes of space are created in the picture. The Paul Smith rug on the other hand, uses flat bands of transparent color in an overlapping arrangement that destroys or negatives both the bands as distinct shapes and the foreground-background separation, and in so doing creates a sense of chaos and confusion in terms of the space in the composition of any one band of color. The overlapping transparencies create new shapes and colors and thereby destroy the "integrity" of any one band of color as distinct.... The name of the Paul Smith design "Carnival" is appropriate for the confetti[-]like bands that appear and disappear against a very shallow middle ground glimpsed occasionally through the overlapping and interwoven bands. The bands are only recognizable as bands if the viewer follows the edge of a shape that changes in color and position as it moves through the design....

misleading impression of the overall appearance of the two works, it appears that these selected portions have been cropped and rotated in order to make a detailed comparison of the elements, colors, and angles of the two designs. The other images attached to the Nemiroff Report, the Complaint, and Defendants' papers and the actual physical exhibits lodged provide the Court with the ability to compare the overall appearance of the two works without being misled or confused by the incomplete images from Exhibit A.

Given the emphasis on the bands, not as "objects" but as "shapes", the design is considered "non-objective" or as not derived from, or alluding to, natural representation and rather to a visual arrangement that, in this case, elicits a feeling. (Mullen Decl. ¶¶ 10–11.)

In his Expert Report, Nemiroff states that both Carnival and Extrapolations # 3 are abstract works featuring defined, rectangular or cylinder shapes. (Id. ¶ D.2.) He states that the colors used in both pieces are very similar in that they both use "natural colors," particularly similar oranges and reds. (Id. ¶ D.3.) He asserts that, while it is possible to distinguish between the cylindrical shapes in Stabile's work and the rectangles in Carnival, this difference "has more to do with medium than expression," because the three-dimensional feel of the cylinders cannot be created on a rug. (Id. ¶ D.2.) He also asserts that the overall presentation of shapes and designs are "nearly identical" and placed at nearly identical angles. (Id. ¶ D.4.; Ex. A.) Nemiroff concludes that Carnival is "strikingly similar" to Extrapolations # 3. (Id. ¶ B.)

Nemiroff attaches several exhibits comparing digital images of the two works. (Id. Exs. A–C). The photographs in Exhibit A comparing the colors and color placement of the shapes in the two works are cropped, rotated, and zoomed-in representations of limited portions of the works.[11] (Id. Ex A.) The images displayed in Exhibit C show the two works juxtaposed against each other from a variety of angles with a variety of light sources. (Id. Ex. C.)

Nemiroff states that, having examined the evidence attached to the Gillespie Dec-

laration regarding the Paul Smith design development process, "it is clear that in the latter part of 2008 through the early weeks of 2009, the style and subject matter of what became 'Carnival' changed substantially." (Id. ¶ B.) He asserts that, "[w]hile it is true Paul Smith did use lines and stripes, and had used them at angles, in the latter part of 2008, the complete style of the nascent 'Carnival' changed from a structured, rigid, conceptual work to an abstract, natural work." Id.

In her Rebuttal Declaration, Mullen states that the digital images provided in the Nemiroff Report look very different from the actual Carnival rug and Extrapolations # 3. (Mullen Rebuttal ¶¶ 3–4.) She notes that the photographs of both works in the Nemiroff Report have been digitally modified, and make selective comparisons of incomplete portions of the digitally altered works. (Id. ¶ 4.) She states that Exhibit A of the Nemiroff Report consists of only one fifth of the entire Carnival rug design, has been rotated on a horizontal axis, and shows the underside of the rug, rather than the top portion that is meant to be visible to viewers. (Id. ¶ 7; Nemiroff Report, Ex. A.) She notes that the shapes, design, and color palette of the Carnival rug look dramatically different in these digital images than in the actual rug. (Id. ¶¶ 3–6.) Mullen reiterates that the bands of the Carnival rug and the cylinders of Extrapolations # 3 are not at the same angles or arranged in the same way. (Id. ¶ 12.)

Mullen also notes that, contrary to Nemiroff's assertion, it is possible to replicate a three-dimensional effect in a rug, and artists have done so for centuries. (Id. ¶ 13.) She attaches several examples from as far

---

11. Paul Smith has submitted a declaration from Una Malan, West Coast Director for the United States for the Rug Company Limited, stating that the images of the Carnival Rug in Exhibit A of the Nemiroff Report "cannot be found anywhere on the front face of the rug." Declaration of Una Malan [Doc. # 50-2.] Paul Smith does not appear to object to the admissibility of the Nemiroff Report or exhibits.

back as the sixteenth century. (*Id.* ¶ 13; Defs.' Exs. 194–195.)

### F. Artistic Representations of Colored Stripes Against a Background

In her Declaration, Mullen identifies myriad uses of colored stripes against a background beginning in the mid–20th century with post-war artists such as Ken-

neth Noland, Morris Louis, who followed in the footsteps of Piet Mondrian and Josef Albers, artists who worked with abstract shapes and color. Declaration of Denise Mullen ("Mullen Decl.") ¶ 8. [Doc. # 35–2.] More recently, artists such as Bridget Riley, Sol LeWitt, Orfeo Quagliata, and Tim Bavington have used this compositional device. *Id.* Some examples follow:

*Morris Louis, Beth Aleph (1959–1960),* *Defs.' Ex. 178 [Doc. # 35–4].*

*Bridget Riley, Coloured Greys II (1972),*
*Defs.' Ex. 178.*

*Sol Lewitt, Vertical Brushstrokes (1995),*
*Defs.' Ex. 178.*

## III.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Wash. Mut. Inc. v. United States,* 636 F.3d 1207, 1216 (9th Cir.2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris,* 682 F.3d 1144, 1147 (9th Cir.2012) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e)); *see also Norse v. City of Santa Cruz,* 629 F.3d 966, 973 (9th Cir.2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV.

## DISCUSSION

### A. Copyright Infringement

■ "To prove copyright infringement, a plaintiff must demonstrate (1) ownership of the allegedly infringed work and (2) copying of the protected elements of the work by the defendant." *Pasillas v. McDonald's Corp.,* 927 F.2d 440, 442 (9th Cir.1991) (internal citation omitted). The parties do not dispute that Stabile owns a valid copyright in Extrapolations # 3. The Court will therefore direct its attention to the question of whether the work was copied.

■ "Because direct copying is difficult to prove, a plaintiff can satisfy the second element by demonstrating that (a) the defendant had access to the allegedly infringed work and (b) the two works are substantially similar in both idea and expression of that idea." *Id.* In the alternative, copying can be established by showing that the accused design is so "strikingly similar" to the copyrighted work that no explanation other than copying is plausible. *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 485 (9th Cir.2000).

### 1. Defendants Did Not Have Access to Extrapolations # 3

■ "Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work." *Art Attacks Ink, LLC v. MGA Entm't Inc.,* 581 F.3d 1138, 1143 (9th Cir.2009) (internal citation and quotation marks omitted). "Proof of access requires an opportunity to view or to copy plaintiff's work. This is often described as providing a reasonable opportunity or reasonable possibility of viewing the plaintiff's work." *Three Boys*

*Music Corp.*, 212 F.3d at 482 (internal quotation marks and citations omitted).

▮ A reasonable opportunity or possibility of viewing consists of more than a "bare possibility" or "mere speculation or conjecture." *Id.* (internal quotation marks and citations omitted). Access can be proven through circumstantial evidence by: "(1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated." *Art Attacks Ink, LLC,* 581 F.3d at 1143. "At times, distinguishing a bare possibility from a reasonable possibility will present a close question." *Three Boys Music Corp.,* 212 F.3d at 482 (citation and quotation marks omitted).

The extent of the dissemination of Extrapolations #3 is as follows: (1) it was displayed for around fifteen years in two popular Southern California restaurants until it was sold to a private collector in 2003, (2) 18 prints were made and at least one of them sold to someone in London, (3) it may have been displayed on Stabile's website, but it is not clear during which time period, and (4) it appears to currently be for sale on the One King's Lane website.

Stabile has put forth no specific "chain of events" linking her work to Defendants' access other than the conclusory assertion that "[b]etween December 2008 and mid-January 2009, 'Carnival' began to look like Stabile's work." (Reply SUF ¶ 47.) The possibility that Gillespie, Brittain, or one of Paul Smith's other designers could have seen the image on the website (in spite of the fact that the image may not have been displayed there during that time period, or at all), the single print that made its way to London, or the original painting hanging in restaurants in Southern California (where neither Gillespie nor Brittain has ever been) is not enough to amount to a "reasonable possibility" that any of the

alleged infringers had the chance to view the protected work. *See, e.g., Art Attacks Ink, LLC,* 581 F.3d at 1144 (insufficient chain of events showing reasonable possibility of access where there was only a "slight chance" that alleged infringer visited the location where design was displayed during the relevant time period).

Extrapolation #3 has not been "widely disseminated." Even if an inference can be drawn that it appeared at one time on Plaintiff's website, simply displaying an image on a website for an undeterminable period of time is insufficient to demonstrate that it was widely disseminated. *Art Attacks,* 581 F.3d at 1145 (design not widely disseminated where it was one of several images to appear on a webpage, the site was slow to load, and the webpage did not include "meta tags" that would allow a potential viewer to find the design in a search engine). Similarly, the sale of 18 prints or display in a single location is not sufficient to be considered widely disseminated. *Rice v. Fox Broad. Co.,* 330 F.3d 1170, 1178 (9th Cir.2003) (owner's sale of 17,000 copies of copyrighted video not sufficient to show that video was widely disseminated); *Jason v. Fonda,* 526 F.Supp. 774, 776 (C.D.Cal.1981) (*adopted and aff'd by Jason v. Fonda,* 698 F.2d 966 (9th Cir.1982)) (book sales of no more than 2,000 copies nationwide and no more than 700 copies in Southern California did not create more than a bare possibility of access); *Art Attacks Ink,* 581 F.3d at 1144 (T-shirt design not widely disseminated even though designs were displayed at fair booths and kiosks, on persons, wearing the shirt, and the Internet).

Even drawing all reasonable inferences in favor of the non-moving party, no reasonable juror could find that there is more than a "bare" possibility that Defendants had access to Extrapolations #3 during the relevant time period. Because there is

insufficient evidence to create a triable issue regarding access, the court need not reach the question of substantial similarity between the works.

### 2. Striking Similarity

 "[I]n rare cases, a plaintiff can prove copying even without proof of access if he can show that the two works are not only similar, but are so strikingly similar as to preclude the possibility of independent creation." *Gable v. Nat'l Broad. Co.,* 727 F.Supp.2d 815, 823 (C.D.Cal.2010), *aff'd sub nom. Gable v. Nat'l Broad. Co.,* 438 Fed.Appx. 587 (9th Cir.2011); *see also Three Boys Music,* 212 F.3d at 485 ("in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the [works] were 'strikingly similar'") (internal citation omitted). "Proof of striking similarity is an alternative means of proving 'copying' where proof of access is absent." *Baxter v. MCA, Inc.,* 812 F.2d 421, 424 (9th Cir. 1987).

Summary judgment is appropriate if "no reasonable juror could find [striking] similarity of ideas and expression, viewing the evidence in the light most favorable to the nonmoving party." *Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042, 1045 (9th Cir.1994); *Cox v. Abrams,* 1997 WL 251532 at *4 (S.D.N.Y. May 14, 1997); *see also Gal v. Viacom Int'l, Inc.,* 518 F.Supp.2d 526, 543 (S.D.N.Y.2007) ("While similarity is generally a question of fact for a jury, summary judgment is appropriate on the issue where the similarity concerns only noncopyrightable elements of plaintiff['s] work or no reasonable trier of fact could find the works ... similar to the requisite degree.").

 "Striking similarity is a high bar." *Briggs v. Blomkamp,* 70 F.Supp.3d 1155, 1166–1167 (N.D.Cal.2014). "To show a striking similarity between works, a plaintiff must produce evidence that the ac-

cused work *could not possibly* have been the result of independent creation." *Seals–McClellan v. Dreamworks, Inc.,* 120 Fed.Appx. 3, 4 (9th Cir.2004) (citing *Walker v. Univ. Books, Inc.,* 602 F.2d 859, 864 (9th Cir.1979)) (emphasis in original); *see also Stewart v. Wachowski,* 574 F.Supp.2d 1074, 1103 (C.D.Cal.2005) ("At base, 'striking similarity' simply means that in human experience it is virtually impossible that the two works could have been independently created.") (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.02[B] (2005)) (internal quotation marks omitted).

#### a. Application of the Extrinsic Test

 Courts in the Ninth Circuit apply the "extrinsic" test to assess the similarity of two works at the summary judgment stage. *Funky Films, Inc. v. Time Warner Entm't Co., L.P.,* 462 F.3d 1072, 1077 (9th Cir.2006) (citing *Shaw v. Lindheim,* 919 F.2d 1353, 1360–61 (9th Cir. 1990)) ("At summary judgment, courts apply only the extrinsic test"). The extrinsic test is an "objective comparison of specific expressive elements" and focuses on the "articulable similarities" between the two works. *Id.* (quoting *Cavalier v. Random House, Inc.,* 297 F.3d 815, 822 (9th Cir. 2002)). The "extrinsic test often requires analytical dissection of a work and expert testimony." *Rice v. Fox Broad. Co.,* 330 F.3d 1170, 1179 (9th Cir.2003) (quoting *Three Boys Music Corp.,* 212 F.3d at 485). "[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment." *Id.* at 1180.

"While expert testimony may be necessary to establish striking similarity in 'technical' areas such as music, in many cases, the trier of fact is equipped to make this determination without expert assistance." *Wachowski,* 574 F.Supp.2d at 1103 n. 121 (quoting 4 Melville B. Nimmer

& David Nimmer, Nimmer on Copyright, § 13.02[B] (2005)) (internal quotation marks omitted); *see also Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir.2002) (assessing similarity of visual designs on basis of court's examination of the elements rather than expert testimony); *Aeropostale*, 676 F.3d at 850 (same).

Courts are generally wary of granting summary judgment where conflicting expert reports are present. *Miller v. Corr. Corp. of Am. Cent. Arizona*, 239 Fed.Appx. 396 (9th Cir.2007) (citing *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979)). "Weighing evidence, determining credibility, and drawing inferences from facts remain jury functions which may not be undertaken by the trial judge." *Baxter v. MCA, Inc.*, 812 F.2d 421, 424 (9th Cir. 1987).

Nonetheless, courts have rejected or discounted expert evidence regarding striking similarity at the summary judgment stage where such evidence was conclusory, contradictory, failed to assert that independent creation was not possible, or compared non-protectable elements. *See, e.g., Vargas v. Transeau*, 514 F.Supp.2d 439, 444 (S.D.N.Y.2007), *aff'd sub nom. Vargas v. Pfizer, Inc.*, 352 Fed.Appx. 458 (2d Cir.2009) (summary judgment in defendants' favor may not be avoided merely by producing an expert who produces a conclusory report stating that the work was copied); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 (2d Cir. 2003) (rejecting plaintiff's expert's statement that two songs were strikingly similar when the expert had previously claimed that defendant's song was only a "subtle" infringement and expert report asserted only substantial similarity, not striking similarity); *Pringle v. Adams*, No. SACV 10–1656–JST RZx, 2012 WL 1103939, at *6 (C.D.Cal. Mar. 30, 2012), *aff'd*, 556 Fed.Appx. 586 (9th Cir.2014) (no reasonable juror could find even substan-tial similarity between two songs where expert primarily compared non-protectable elements to conclude that they were "strikingly similar"); *Dimmie v. Carey*, 88 F.Supp.2d 142, 149 (S.D.N.Y.2000) (granting summary judgment in defendants' favor where expert did not state that defendant's work could not have been independently created and defendants produced substantial evidence of independent creation); *McRae v. Smith*, 968 F.Supp. 559, 566–67 (D.Colo.1997) (rejecting plaintiff's experts' claim of striking similarity because most of the elements the experts relied on were common musical elements which were not copyrightable).

Here, Plaintiff's Nemiroff Report enumerates similarities in the colors, shapes, angles, and placement of shapes in the two works, and conclusorily asserts that the overall presentation of shapes and designs is "nearly identical." This does not amount to a genuine assertion of *striking* similarity. "The mere existence of multiple similarities is insufficient to meet the test." *Gal v. Viacom Int'l, Inc.*, 518 F.Supp.2d 526, 543 (S.D.N.Y.2007).

Plaintiff's reliance on *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir.2002), to support her claim of striking similarity is also unavailing. The *Random House* court compared the illustrations from two children's picture books and the designs of night lights built into the back cover of those books. *Id.* Upon its own assessment of the features of the illustrations and designs, the court found that the similarities precluded summary judgment on the issue of *substantial similarity. Id. Random House* involved non-abstract representations of stars in striped sleeping caps relaxing on clouds and night lights with the face of a smiling moon or star inside of a book cover. *Id.* at 826–27. The illustrations were accompanied by text that

made clear that both represented the same scenario (the lives of stars during the daytime) and both night lights involved highly similar placement of the light and "on" button. *Id.* The present case involves a comparison between a rug and a painting. The designs of both are abstract and feature colored stripes or cylinders against a background. This is a much less concrete and uniquely identifiable concept than the highly specific and whimsical representations of personified stars or smiling celestial bodies. There are no similar functional design elements to compare here, as opposed to the "on" switch or the light placement of the night lights. More importantly, *Random House* addressed the question of substantial similarity, not striking similarity. The parties in that case did not dispute the question of access to the protected works, and plaintiffs therefore needed only establish substantial similarity in order to overcome summary judgment. 297 F.3d at 822. *Random House* is not a helpful point of comparison for overcoming the much higher bar of "striking similarity."

 On its own assessment of the physical exhibits, rather than the photographs presented by the parties,[12] the Court does not find a "striking similarity" between the specific expressive elements of the two works. Extrapolations #3 features shaded, three-dimensional cylinders or reeds against a distinguishable light-blue background, while Carnival consists of a chaotic series of overlapping semi-transparent bands which change color and shape where they intersect. In examining the physical exhibits, rather than the photographs presented by the parties, the

Court finds the color palettes of the two works to be markedly different. Extrapolations #3 consists of dark, earth-toned browns, reds, blues, and greens with a single brighter orange cylinder against a light-blue background. Carnival features a much lighter range of pastel purples, greens, beiges, and greys, with several brighter highlights of red, orange, and blue against a cream background. Carnival has greater variation of colors and shades because of the shifting colors of the transparent, sometimes overlapping lines.

Nemiroff concludes in his report that Carnival and Extrapolations #3 are "strikingly similar." Nonetheless, an issue of fact is not created "merely by [an expert] reciting the magic words 'strikingly similar' and 'no possibility of independent creation.'" *McRae*, 968 F.Supp. at 567; *see also Tisi v. Patrick*, 97 F.Supp.2d 539, 549 (S.D.N.Y.2000) (merely reciting the "magic words" of "striking similarity" does not create a triable issue of fact sufficient to defeat summary judgment). A conclusory statement unsupported by specific evidence does not give rise to a reasonable inference in favor of the non-moving party.

### b. Strong Evidence of Independent Creation

 "Courts adopting the majority rule generally require that an inference of copying drawn from striking similarity between works be reasonable in light of all the evidence." *Stewart v. Wachowski*, 574 F.Supp.2d 1074, 1098 (C.D.Cal.2005); *see also Century–Fox Film Corp. v. Stonesifer*, 140 F.2d 579, 582 (9th Cir.1944) (assessing whether "striking similarities" in two works amounted to inference of copy-

---

**12.** The Court concurs with Mullen's assertion that the color palettes, shapes, and dimensionality of the works look notably different in the various photographs from both parties than they do in the physical works themselves, particularly given the variety of differ-

ent angles and cropped sections of the works portrayed in the photographs. The Court assesses the physical exhibits as the best possible representation of the appearance of the respective designs.

ing "in the light of all the evidence."). "A plaintiff has not proved striking similarity sufficient to sustain a finding of copying if the evidence as a whole does not preclude any reasonable possibility of independent creation." *Wachowski*, 574 F.Supp.2d at 1098. Evidence of the manner in which a defendant created its work is "logically relevant" to determining whether copying occurred. *Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976).

The Nemiroff Report never expressly asserts a lack of independent creation. *See Dimmie v. Carey*, 88 F.Supp.2d at 149 (granting summary judgment in defendants' favor where expert did not state that defendant's work could not have been independently created and defendants produced substantial evidence of independent creation). Nemiroff points out that the style and subject matter of the designs that ultimately became Carnival "changed substantially" in the latter part of 2008 from what Paul Smith had done previously with lines, stripes, and angles. This is a far cry from an assertion that Carnival *could not possibly* have been the result of independent creation.

In contrast, Defendants have provided substantial and uncontroverted evidence in the form of both declarations and visual records of the manner in which the Carnival design was created, and of a history of artistic influences that largely pre-date the creation of Extrapolations # 3. The Nemiroff Report asserts that the design process "changed substantially" during the time period at issue, but does not controvert the record of Gillespie's design process.

The design on the swatch of fabric on Paul Smith's inspiration board which Smith favored and compared to the window at his jeans store supplies additional evidence that the inspiration for Carnival stemmed from a source separate from Sta-

bile. This strong record of independent creation weighs further against a finding that there is a triable issue as to whether copying occurred "in light of all of the evidence." *Stonesifer*, 140 F.2d at 582.

Even when considering all the evidence in the light most favorable to the non-moving party, the Court finds that no reasonable juror could find such a striking similarity between the two works that the Carnival design could not possibly have been the result of independent creation.

## B. There Can Be No Vicarious and Contributory Infringement

█ Because there is no direct infringement here, there can be no vicarious or contributory copyright infringement. *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S.Ct. 2764, 2776, 162 L.Ed.2d 781 (2005); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir.2007) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." (internal citation and quotation marks omitted)).

## V.

## CONCLUSION

In light of the foregoing, Defendants' motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**